[Civ. No. 30701. Fourth Dist., Div. Three. June 29, 1984.]

HARRY H. HOILES et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
FREEDOM NEWSPAPERS, INC., et al., Real Parties in Interest.

**COUNSEL**

Vernon W. Hunt, Jr., Quan, Cohen, Kurahashi, Hsieh & Scholtz, Richard K. Quan, Kenneth P. Scholtz and Marion C. Fay for Petitioners.

No appearance for Respondent.

Latham & Watkins, Robert E. Currie, Jon D. Anderson, John S. Olson, Rutan & Tucker, Leonard A. Hampel, Edward D. Sybesma, Jr., and Michael T. Hornak for Real Parties in Interest.

**OPINION**

**CROSBY, J.**—Harry H. Hoiles, a minority shareholder and director of Freedom Newspapers, Inc. (FNI), brought suit for breach of fiduciary duty and to dissolve the corporation (Corp. Code, § 1800, subd. (b)). In this original proceeding he and other members of his immediate family seek a writ of mandate after the superior court sustained corporate counsel's invocation of the attorney-client and work product privileges at a deposition as to questions concerning several meetings to plan prelitigation strategy and requests for production of related documents.

I

FNI is a California corporation with its principal offices in Santa Ana. It operates 29 daily newspapers, directly or indirectly, and owns 2 television stations.

R. C. Hoiles started the enterprise some 50 years ago and managed it until his death in 1970. All the corporate stock was then, as now, held by the families of his two sons, Clarence H. Hoiles and Harry H. Hoiles, and his daughter, Mary Jane Hoiles Hardie. Clarence Hoiles was the first to succeed his father as chief executive officer. This dispute began in 1980, when D. R. Segal, president of FNI, suggested it would be wise to begin consideration of Hoiles' successor.

A sequence of family conferences and correspondence produced an archetypical impasse among the heirs of the empire: Harry Hoiles insisted the mantle should pass to him. Brother and sister said no.

In the fall of 1980, Harry Hoiles began to speak of dissolving the corporation. In February and June 1981, he made reorganization proposals to FNI's executive committee. He withdrew the first, and FNI ignored the second. He made his final proposal in August 1981 and indicated he would not relent even if his brother or sister withdrew opposition to his succession. He also suggested he might sell his stock to a buyer outside the family without permitting FNI to bid or match the price.

Against this backdrop a series of urgent meetings ensued among the members of the two allied branches of the family, their spouses, and various officers of FNI to plan a defense to Hoiles' threatened actions. Also in attendance was John Stahr of Latham & Watkins, FNI's long-time corporate counsel and individual counsel to many of the members of the Hoiles family off and on, including Harry Hoiles.

The first meeting occurred at a local hotel on September 18, 1981. Present were the adult members of the Clarence Hoiles and Mary Jane Hoiles Hardie families. The only shareholders in attendance who were not also officers and directors were spouses of officers or directors. The only nonshareholder and nonfamily members present were Stahr and Segal.

Petitioners characterize this affair as a "family meeting," while real parties claim it had a corporate purpose. Although the Hardies were consulting another attorney and considered Stahr to represent FNI only, Stahr testified he attended as attorney for FNI and "the present controlling shareholders of [FNI], . . . the members of the Clarence Hoiles family and the Mary Jane Hoiles Hardie family."[1] Later, he acted, in his words, as a "scrivener for the Clarence Hoiles and Jane Hoiles Hardie families," when he drafted a letter from Clarence Hoiles to Harry Hoiles outlining the proposal developed at the hotel meeting. The letter suggests a buy out of the Harry Hoiles family's interests in FNI and other family businesses. The proposal does commit FNI as the buyer, rather than the two allied families, but Stahr's advice to make the offer through FNI's board of directors was not followed.[2]

---

[1]Now, on the contrary, FNI claims Stahr and his firm represented *only* the corporation and its president, as they do in this proceeding.

[2]The letter itself appears to describe a family rather than corporate meeting: "I want you to know that Bob, Jane and I met with all of the adult members of our families . . . . In view of the foregoing, members of my family and the Hardies have unanimously agreed to a counter proposal . . . ."

The second disputed meeting took place after a session of FNI's executive committee on November 27, 1981. Present were Clarence Hoiles, Robert and Mary Jane Hoiles Hardie, and Stahr.[3] They decided FNI would be recapitalized and Harry Hoiles removed from the executive committee by amending the bylaws to eliminate cumulative voting. Stahr wrote a letter memorializing the recapitalization agreement.

Negotiations went on, however. Stahr met with petitioners' counsel from time to time and communicated with FNI officers concerning their talks with Harry Hoiles. Petitioners seek to question Stahr about one of the latter meetings which took place at Segal's home in January 1982.

On February 7, 1982, the two controlling families held another formal meeting similar to the September 18, 1981 event. Virtually the same persons were present, and matters "going to the heart of this litigation" were discussed. Notably, FNI's board of directors was scheduled to meet the following day.

At the board meeting, the two families offered to support Harry Hoiles' election to the executive committee and also as chief executive officer of a charitable foundation to be established by FNI—provided he signed a redemption agreement to prevent transfer of FNI stock to outsiders. He refused, and the other two families then elected Segal to the executive committee in his place.

On March 15, 1982, Stahr met with the Hardies, Segal, and several other officers and directors and their spouses and delivered a 23-page report concerning the dispute. The chief topics of discussion were the proposed recapitalization of FNI, the negotiations with petitioners' attorney, and how FNI might be managed if Harry Hoiles' family withdrew.

Petitioners commenced this action to dissolve the corporation and for breach of fiduciary duty in April 1982. When Stahr asserted the attorney-client and work product privilege at his deposition as to the discussions at the meetings and documents relating to the squabble with Harry Hoiles, petitioners brought this writ proceeding. They argue, (1) a closely held corporation has no attorney-client privilege concerning the communications of some of its owners as against other owners; (2) FNI's privilege does not shield corporate counsel's communications with some officers, directors, and shareholders at "family meetings"; (3) Harry Hoiles is entitled to question Stahr as a corporate director, if not as a shareholder; and (4) notwith-

---

[3]Clarence Hoiles died the following month.

standing the attorney-client privilege, the so-called "fraud exception" applies, based on the allegation of breach of fiduciary duty.

## II

■ Corporations do enjoy an attorney-client privilege in California. (*D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 732 [36 Cal.Rptr. 468, 388 P.2d 700]; Evid. Code, §§ 175, 953, subd. (d).) And the privilege applies to matters not necessarily discussed in contemplation of litigation. (*Rumac, Inc.* v. *Bottomley* (1983) 143 Cal.App.3d 810 [192 Cal.Rptr. 104].) Petitioners do not advance a serious argument to the contrary, but instead assert the privilege should not be upheld between owners of closely held corporations.

This contention depends on the seemingly logical, but nonetheless spurious, notion that a closely held corporation bears such a strong resemblance to a partnership its shareholders should be viewed as the equivalent of partners or corporate directors for purposes of the privilege. We are told, for example, owners and managers are usually the same people in both entities and a corporation has no independent interest in its continued existence beyond the desires of its several owners. Consequently, as to them, a corporation's separate legal identity is meaningless and the attorney-client privilege should not exist.

We agree "[t]here is nothing sacred in the life of a corporation that transcends the interests of its shareholders. . . ." (*In re Security Finance Co.* (1957) 49 Cal.2d 370, 377 [317 P.2d 1].) Nevertheless, "the election to dissolve is the election of the corporation, not merely of shareholders representing 50 percent of the voting power, although it is through their consent that the election is made." (*Ibid.*) In contrast to petitioners' theory, which is unsupported by citation to any controlling authority, the Evidence Code quite clearly provides for an attorney-client privilege for all corporations with no exception for shareholders of closely held entities. (Evid. Code, §§ 175, 953, subd. (d).) Nor is it our proper function to create one, however reasonable; "the area of privilege 'is one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme.' [Citations.]" (*Dickerson* v. *Superior Court* (1982) 135 Cal.App.3d 93, 99 [185 Cal.Rptr. 97].)

The petition also argues for application of the so-called *Garner* rule, a judicially created exception of federal origin which provides the attorney-client privilege is "subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." (*Garner* v. *Wolfinbarger* (5th Cir. 1970) 430 F.2d 1093, 1103-1104.) *Garner's* continued

vitality is suspect, however, even in federal courts. ■ ■■■■ (See Note, *The Attorney-Client Privilege and the Corporation in Shareholder Litigation* (1977) 50 So.Cal.L.Rev. 303, 317-324.)[4] ■ And it has been squarely rejected in this state in any event. The *Dickerson* opinion explains, "The *Garner* court was empowered to create this new exception by rule 501 of the Federal Rules of Evidence . . . . The courts of this state, however, are not free to create new privileges as a matter of judicial policy and must apply only those which have been created by statute. [Citations.]" (*Dickerson* v. *Superior Court, supra,* 135 Cal.App.3d at p. 99.) The court went on to add, "Thus although the [*Garner*] rule . . . may be a desirable means of preventing abuse of the attorney-client privilege by corporate fiduciaries, this court cannot properly alter the legislative scheme by adopting such a nonstatutory exception. In the absence of an applicable statutory exception to the privilege, respondent court's order compelling answers must be held a violation of the corporation's attorney-client privilege."[5] (*Id.,* at pp. 99-100.) Consequently, no extraordinary avenue is available to petitioners to pierce the privilege in their capacity as shareholders.

III

Petitioners attempt to portray the various gatherings as "family meetings" in which Stahr was acting outside the scope of his duties as corporate coun-

---

[4]Petitioners also argue the joint client exception of Evidence Code section 962 should apply here as the cited law review note states it might in the case of closely held corporations. (*Id.,* at p. 320, fn. 95.) Section 962 of the Evidence Code provides, "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)."

Harry Hoiles does not claim he ever consulted Stahr on the corporate dissolution matter, however, although Stahr represented him in the past on personal matters. Quite to the contrary, Hoiles had his own counsel who dealt with Stahr in his role as attorney for FNI. Under these circumstances, we do not believe application of the joint client doctrine is appropriate to allow petitioners access to information Stahr acquired in his representation of FNI and another branch or branches of the family.

[5]*Goldstein* v. *Lees* (1975) 46 Cal.App.3d 614 [120 Cal.Rptr. 253] does recognize the *Garner* rule in a passing dictum. That case is more noteworthy here for its holding, however; it is a breach of professional ethics for a former corporate counsel to represent a minority shareholder in a proxy fight: "Clearly, if Kirshman were counsel to the corporation, he could not, consistently with his position as general counsel, act as proxy for one contending group of shareholders. As the Committee on Professional Ethics and Grievances of the American Bar Association stated in Opinion 86: 'In acting as the corporation's legal adviser he must refrain from taking part in any controversies or factional differences which may exist among shareholders as to its control. When his opinion is sought by those entitled to it, or when it becomes his duty to voice it, he must be in a position to give it without bias or prejudice and to have it recognized as being so given. Unless he is in that position his usefulness to his client is impaired.' This duty to act without bias or prejudice does not dissolve merely because the attorney has been discharged." (*Id.,* at p. 622; see also *Woods* v. *Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185] and *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232].)

sel. They *can* be so characterized in the sense that most of the participants were related by blood or marriage, but each of the meetings related in whole or in part to FNI's response to Harry Hoiles' demands.

 To be sure, the majority shareholders' interests and those of FNI appear to have been treated interchangeably, since Stahr purported to represent both in the apparent belief their interests were not in conflict.[6] But the superior court's implied finding the meetings were for corporate purposes is supported by substantial evidence; accordingly, we cannot hold the ruling was an abuse of discretion. (*West Pico Furniture Co.* v. *Superior Court* (1961) 56 Cal.2d 407, 414-415 [15 Cal.Rptr. 119, 364 P.2d 295].)

 In a related argument, because spouses of officers and directors attended several of the meetings, petitioners contend the privilege is inapplicable by definition. Section 952 of the Evidence Code provides, "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information *to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted,* and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Italics added.) Again, however, substantial evidence supports the notion all those present were there "to further the interest" of FNI or assist in "the accomplishment of [Stahr's] purpose." The "privilege extends to communications which are intended to be confidential, if they are made to attorneys, to family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant." (*Cooke* v. *Superior Court* (1978) 83 Cal.App.3d 582, 588 [147 Cal.Rptr. 915]; see also *Insurance Co. of North America* v. *Superior Court* (1980) 108 Cal.App.3d 758, 771 [166 Cal.Rptr. 880, 14 A.L.R.4th 581].)

---

[6]We express no opinion on the conflict question. There is no need to do so. The corporate holder of an attorney-client privilege does not lose its protection as to third parties simply because its attorney also represents others, including the principals of the corporation. (*Meehan* v. *Hopps* (1956) 144 Cal.App.2d 284, 293 [301 P.2d 10].) In other words, even if petitioners were to achieve recusal of FNI's counsel—which they have not sought to our knowledge—information obtained during the existence of the attorney-client relationship would retain its privileged character. (*Global Van Lines* v. *Superior Court* (1983) 144 Cal.App.3d 483 [192 Cal.Rptr. 609]; *Goldstein* v. *Lees, supra,* 46 Cal.App.3d 614.)

## IV

■ There is a short answer to petitioners' claim that Harry Hoiles has a right to question corporate counsel in his role as a director (Corp. Code, § 1602). Assuming the point is correct, Hoiles has not brought suit as a director, only as a shareholder.

In answer to a similar contention of an individual whose attorneys were involved in other litigation adverse to the corporation and who brought suit as a shareholder *and* director, the Delaware Court of Chancery permitted access to otherwise privileged corporate information to the director in that capacity, but not to the attorneys. Reminding the director of his fiduciary obligation to the corporation the chancellor observed, "A director . . . has the right to inspect corporate books and records; that right is correlative with his duty to protect and preserve the corporation. He is a fiduciary and in order to meet his obligation as such he must have access to books and records; indeed he often has a duty to consult them. [Citations.]" (*Henshaw* v. *American Cement Corporation* (1969) 252 A.2d 125, 128.)

The chancellor also found the director "made out a prima facie right to inspection. . . . In other words, [the director] showed a purpose germane to his position as a director and that entitles him to an examination of the books and records. His purpose is not improper because of the possibility that he may abuse his position as a director and make information available to persons hostile to the Corporation or otherwise not entitled to it. If [he] does violate his fiduciary duty in this regard, then the Corporation has its remedy in the courts. [Citation.]" (*Id.,* at p. 129.) After this not so subtle warning—which is repeated in the last line of the opinion—the chancellor went on to place restrictions on the director's use of the information: "The question here is how [the directors'] right to agents and attorneys of his own choosing is to be accommodated to the Corporation's legitimate interest in protecting its position in a lawsuit. I am in no way concerned with the merits of that suit. But it begs common sense and elemental notions of fairness to say that the Corporation must submit its records (including those dealing with the very substance of the fraud suit . . .) for inspection by a person whose interest in pending litigation is adverse to the Corporation, merely because that person is selected for the purpose as the agent of a director. This would indeed be back-door discovery unbound by work-product, privilege or any other limitation upon discovery. [The director's] personal preference [in choice of counsel] must here give way to protection of the Corporate interest." (*Id.,* at p. 130.)

We believe *Henshaw* provides a reasonable solution to the problem presented there and that Hoiles is arguably entitled to review corporate legal

documents and to question Stahr *in his role as a director* here. But the issue is not presently before us. Hoiles has not sued in that capacity and has not requested the information on a fiduciary basis and independent of his counsel in this proceeding. The attorney-client and work product privileges (Code Civ. Proc., § 2016, subd. (b)) were thus properly asserted and upheld despite Hoiles' status as a director.

## V

■ Finally, the claim the court abused its discretion because it did not apply the "fraud exception" to the attorney-client privilege (Evid. Code, § 956) is meritless. The point was concededly raised for the first time in this court, although petitioners claim their motion "did expressly rely on facts showing breach of fiduciary duty." The argument comes too late. The superior court can hardly be faulted for failing to determine whether petitioners carried their burden of proving the exception when it was not asked to do so. (*Travelers Ins. Companies* v. *Superior Court* (1983) 143 Cal.App.3d 436, 446-447 [191 Cal.Rptr. 871].)

The alternative writ is discharged. The peremptory writ is denied. Respondents shall recover their costs in this proceeding.

Trotter, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied July 25, 1984, and petitioners' application for a hearing by the Supreme Court was denied October 4, 1984. Lucas, J., was of the opinion that the application should be granted.