**Raymond H. WECHSLER, Administrative Trustee, Plaintiff,**

v.

**SQUADRON, ELLENOFF, PLESENT & SHEINFELD, LLP, Defendant.**

**No. 96 CIV.4115(WK)(AJP).**

United States District Court, S.D. New York.

Feb. 9, 1998.

Richard Mancino, Willkie, Farr & Gallagher, New York City, for Plaintiff.

Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel, New York City, for Defendant.

## ORDER

WHITMAN KNAPP, Senior District Judge.

On February 4, 1998, we issued an Opinion and Order ("the Opinion") rejecting Magistrate Judge Andrew J. Peck's Report recommending that we grant plaintiff Raymond H. Wechsler ("trustee" and/or "plaintiff"), administrative trustee of the bankrupt Towers Financial Corporation ("Towers"), motion to file a proposed amended complaint against Towers' former law firm Squadron, Ellenoff, Plesent, Sheinfeld, LLP ("Squadron Ellenoff" and/or "defendant"). We have concluded that we were in error.

The essential facts are adequately stated in the Opinion. Two basic questions are presented: (1) what would Thomas B. Evans, Jr. ("Evans") and/or Ben F. Barnes ("Barnes")—two concededly innocent Towers' directors—have done had the defendant law firm (through one of its partners) fully advised them of the facts; and (2) would any actions that Evans and Barnes might have taken been effective in ending the fraud.

As to the first question, we were satisfied that both Evans and Barnes testified truthfully about their present recollection of their then state of mind. But we had—and expressed—doubt as to whether their memories were accurate. Moreover, we were greatly influenced by defendant's argument that "no rational person" would have "willingly risked the enormous personal liability attendant to" disclosing information to the SEC, where such disclosure could amount to a breach of their fiduciary duty to Towers. *See* Defendant's Objections to Magistrate Judge Pecks' Recommendation that the Administrative Trustee Be Granted Further Leave to Amend at 19–20.

Evans states that he would have consulted his attorney before taking any action, while Judge Peck's Report suggests that there really was no such risk. *See* Report at 15–24. However, since we released our opinion we have begun to feel that the real wonder is: Who is it that defendant supposes would have called this possible risk to the attention of Evans and Barnes? The obvious answer would appear to be the Squadron Ellenoff partner whose then mission in life apparently was to hold the SEC at bay while his client continued to collect millions of dollars from an unsuspecting public. It seems rather obscene to argue that defendant should be exonerated because of the ability of one of its partners to intimidate honest directors. At the very least, it is an argument that should be made, if at all, before the ultimate trier of fact.

Regardless of how any of the foregoing speculations might be resolved, it is clear that Evans and Barnes unequivocal testimony as to how they would have acted had they been properly informed is sufficient to raise an issue that can only be resolved by the trier of fact.

As to the second question, we rejected Judge Peck's recommendation on our finding that there was no evidence before us to indicate that the SEC would have been in any way aided by anything that the honest directors might have done, despite the obvious existence of many witnesses who could have shed light on the question had plaintiff taken the trouble to contact them. On reconsideration we realize that this was not a valid reason for rejecting Judge Peck's recommendation. He was obviously aware of the existence of these witnesses and could well have felt that it would save judicial time to develop these facts in the course of preparation for trial. Accordingly, we withdraw our February 4th opinion, and grant plaintiff's motion for leave to file the proposed amended complaint.

The foregoing does not, however, end our inquiry. In addition to its argument that plaintiff lacked standing, defendant had moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the original complaint on the ground that it failed to allege the elements necessary to state a claim for malpractice. Having dismissed that complaint for lack of standing, we never reached this question. By letter dated November 17, 1997, defendant asks us to consider these arguments as having been made in support of a motion to dismiss the proposed amended complaint should we permit it to be filed. We so consider them, and turn to the question of whether the amended complaint states a claim of malpractice.

The parties agree that an allegation of actual damages (and causation) is essential to a claim of malpractice against an attorney. In this connection, Judge Peck, at page 16 of his Report dated March 16, 1997, observed that "[i]f the Trustee can prove malpractice, in light of the allegation that Squadron Ellenoff's loyalty was to Hoffenberg instead of Towers, the Trustee has a viable damage claim a least for the legal fees Towers paid to Squadron Ellenoff." (citations omitted) Defendant objects to this conclusion, arguing that as a matter of law, mere payment of attorney fees cannot constitute the element of damages necessary to state a claim of malpractice.

Assuming defendant's position to be correct, the proposed amended complaint also alleges that by its success in holding the SEC at bay, the defendant law firm materially increased Hoffenberg's opportunities to defraud the public and thus increased Towers' liability. That allegation, if proven, would satisfy the elements of actual injury and causation. It is therefore unnecessary on the motion before us to decide whether or not payment of attorney fees could alone have done so. Accordingly, defendant's motion to dismiss pursuant to Rule 12(b)(6) is denied.

### CONCLUSION

Having withdrawn our February 4th opinion, plaintiff's motion for leave to file the proposed amended complaint is granted. Defendant's motion, pursuant to Rule 12(b)(6), to dismiss that complaint is denied.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.
To the Honorable Whitman Knapp, United States District Judge.

The motion before the Court raises a question of first impression: Can a director of a public corporation who believes that the company is engaged in ongoing securities fraud "blow the whistle" by disclosing to the SEC information protected by the company's attorney-client privilege, where the company's Board has not waived the privilege? As a matter of public policy, the Court holds that the answer is yes, although the company could sue the whistle-blowing director for breach of fiduciary duty if such disclosure were not in the company's best interest.

This action, by the Administrative Trustee of the bankrupt Towers Financial Corporation against Towers' former law firm, Squadron Ellenoff Plesent & Sheinfeld LLP, is but one of many suits arising from Towers' Ponzi scheme.

In a Report and Recommendation dated March 26, 1997, I recommended denial of defendant Squadron Ellenoff's motion to dismiss. By Opinion dated July 28, 1997, Judge

Knapp affirmed my Report and Recommendation, with an important modification:

> Accordingly, we agree with Judge Peck's finding that the *[Shearson Lehman Hutton, Inc. v.] Wagoner[,* 944 F.2d 114 (2d Cir.1991)*]* rule only applies where all relevant shareholders and/or decisionmakers are involved in the fraud, and therefore, adopt the Report with respect to this section. Absent such a finding, the fraud cannot be imputed to the corporation, thereby granting the trustee of that corporation standing to litigate a malpractice claim against third parties.

> However, we disagree with Judge Peck's conclusion that the Complaint actually alleges the existence of an innocent member of Towers' management who would have been able to prevent the fraud had he known about it. As discussed above, absent such an allegation in the Complaint the trustee would not have standing to assert the instant claims under the *Wagoner* rule. Accordingly, defendant's motion to dismiss is granted.

> We refer the matter back to Judge Peck to oversee any discovery he deems necessary and appropriate to determine *whether plaintiff could amend the Complaint to allege the existence of some person(s) involved in Towers' management who was ignorant of the ongoing fraud and could and would if advised of facts known to defendant have taken steps to bring the fraudulent conduct to an end.* To be valid a complaint would have to *identify such person(s), and explain how he could and would have brought the fraud to an end.* If Judge Peck concludes that plaintiff could make such allegations in light of the pleading requirements of Rule 11, plaintiff may file an amended complaint.

*Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP,* 212 B.R. 34, 36 (S.D.N.Y. 1997) (Knapp, D.J. & Peck, M.J.) (emphasis added & fn. omitted). Familiarity with Judge Knapp's and my prior Opinions and Reports and Recommendations are assumed.

The Trustee has filed a motion for leave to amend, including a copy of the proposed Second Amended Complaint, accompanied by the affidavit of the alleged "innocent director," Thomas B. Evans, Jr. After the Court held oral argument on the motion on October 17, 1997, the Trustee filed a supplemental affidavit from Mr. Evans and an affidavit from a second alleged "innocent director," Ben F. Barnes.

## The Governing Legal Standard on This Motion

The parties hotly dispute the appropriate legal standard to apply to this motion.

Judge Knapp dismissed the Trustee's complaint without prejudice to repleading if the Trustee was able. *Wechsler v. Squadron, Ellenoff,* 212 B.R. 34, 36. The Trustee has sought leave to amend, which Squadron Ellenoff opposes on the ground that amendment would be futile. (*See generally* Squadron Br.) The appropriate standard, therefore, is whether the proposed Second Amended Complaint fails to state a claim, the traditional Fed.R.Civ.P. 12(b) standard. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979) ("A trial court does not abuse its discretion in denying leave to amend a complaint which even as amended would fail to state a cause of action."); *Skylon Corp. v. Guilford Mills, Inc.,* 93 Civ. 5581, 1997 WL 88894 at *1 (S.D.N.Y. March 3, 1997) (motion to dismiss standard is "a standard substantially the same as the standard for futility under a motion to amend"); *Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1098 (S.D.N.Y.1992) ("Leave to amend will not be granted under Rule 15(a), however, where there are no colorable grounds for the proposed claim—that is, where amendment would prove futile.... The 'colorable grounds' requirement mandates 'an inquiry—comparable to that required by Fed.R.Civ.P. 12(b)(6) ... as to whether the proposed amendments state a cognizable claim....' In sum, amendment is futile if a proposed claim could not withstand a motion to dismiss made pursuant to Fed. R.Civ.P. 12(b)(6)."); *Journal Publishing Co. v. American Home Assurance Co.,* 771 F.Supp. 632, 634 (S.D.N.Y.1991) ("'"A district court is justified in denying an amendment if the proposed amendment could not withstand a motion to dismiss.'"" ... The Proposed Amended Complaint may therefore

be scrutinized as if defendants' objections to the amendments constituted a motion to dismiss under Fed.R.Civ.P. 12(b)(6)."); *Hannah v. Metro–North Commuter R.R.*, 753 F.Supp. 1169, 1176 (S.D.N.Y.1990) (same).

Squadron Ellenoff, however, contends that because the issue here is the Trustee's standing, the standard is different:

> MR. KAUFMANN [Squadron Ellenoff's counsel]: This is a standing motion to dismiss. The standard there is not like a motion to dismiss for failure to state a claim where the burden is on the defendant and all allegations are deemed to be true. Here, the Second Circuit says and the Supreme Court says, the burden is on the party seeking to establish standing, and in this instance doubts are resolved in favor of us, not the trustee. So the standard to which the court referred is not the usual motion to dismiss for failure to state a claim, it's a very different standard.

(10/17/97 Oral Arg. Tr. at 21.) Squadron Ellenoff further contends that the "Trustee now bears the 'burden of persuasion' to establish the facts necessary to obtain standing." (Squadron Br. at 4.)

Squadron Ellenoff is correct that the burden of proof of standing is on the Trustee, but incorrect in claiming that the Trustee has not adequately satisfied its burden at the pleading stage.

■■■ The Supreme Court summarized the burden on the plaintiff of establishing standing at the various stages of a case:

> The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." In re-

sponse to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (citations omitted); *see also, e.g., National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994)(applying *Lujan* principle and holding that "[n]othing more [than plaintiff's allegations in complaint] is needed to confer standing ... at the pleading stage"); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) ("it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' ... 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" Plaintiffs' affidavits were not sufficient to show standing to challenge certain aspects of statute); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109, 115, 99 S.Ct. 1601, 1613, 1615–16, 60 L.Ed.2d 66 (1979) (as to standing, Court will "'accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party,' ... as standing was challenged largely on the basis of the pleadings." Court "conclude[s] that the facts alleged in the complaints and revealed by initial discovery are sufficient to provide standing under Art. III. It remains open to petitioners, of course, to contest these facts at trial."); *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) (party asserting federal court jurisdiction "must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing." Plaintiff "must carry throughout the litigation the burden of showing that he is properly in court," and if the opposing party or the Court challenges plaintiff's standing, plaintiff must support his allegations "by competent proof."); *Fund for Animals v. Babbitt*, 89 F.3d 128, 134 (2d Cir.

1996) (2d Cir.1996) (applying *Lujan* principle at summary judgment stage); *Schulz v. Williams*, 44 F.3d 48, 52 n. 4 (2d Cir.1994) (applying Lujan principle after trial); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58 (2d Cir.1994) (applying *Lujan* at pleading stage and finding allegations in complaint sufficient to satisfy standing requirement); *Long Island Soundkeeper Fund, Inc. v. New York Athletic Club*, 94 Civ. 0436, 1996 WL 131863 at *4 (S.D.N.Y. March 22, 1996) ("The Supreme Court has pointed out that 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation.' *Lujan*, 112 S.Ct. at 2136. Defendant has made a motion for summary judgment on the issue of Plaintiffs' standing to sue. Accordingly, it is necessary to determine whether Plaintiffs have provided facts sufficient to carry their burden of proof of standing at this point in the litigation."); *New Alliance Party v. FBI*, 858 F.Supp. 425, 429–30 (S.D.N.Y.1994) ("Moreover, at the pleading stage, it is presumed that any general allegations raised in the complaint will 'embrace those specific facts that are necessary to support the claim.' ... While plaintiffs admit that standing analysis is based upon the allegations in a complaint, they have failed to raise the factual allegations necessary to find a justiciable controversy in this case."); *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 828 F.Supp. 1114, 1124 (S.D.N.Y.1993) ("the burden of establishing the elements of standing falls upon the plaintiff, and ... the burden of proof increases 'with the manner and degree of evidence required at the successive stages of the litigation' "), *aff'd*, 32 F.3d 690 (2d Cir.1994); *State of New York v. Reilly*, 143 F.R.D. 487, 491 (N.D.N.Y.1992) ("The plaintiff bears the burden of establishing these [standing] elements.... Furthermore, because all of these elements are an indispensable part of the plaintiff's case, they must be supported with the manner and degree of evidence required at each successive stage of the litigation....

[A]t the pleading stage, general factual allegations of [standing] may suffice.... This is so because on a motion to dismiss, the court '[p]resumes that general allegations embrace those specific facts that are necessary to support the claim.' "); *Media Ranch, Inc. v. Manhattan Cable Television, Inc.*, 757 F.Supp. 310, 317 (S.D.N.Y.1991) ("In deciding questions of standing, courts are required to accept a plaintiff's allegations as true and to construe those allegations in a manner favorable to the plaintiff.... [I]t must be borne in mind that no discovery has yet occurred in this case. Consequently, at this stage of the proceedings, this Court accepts [plaintiff's] contention" as to standing).

█ Here, the Trustee not only has appropriately alleged in the proposed Second Amended Complaint the specific facts required by Judge Knapp's prior opinion as to standing—that is, that Evans and Barnes were "innocent" directors who could and would have stopped the Towers' fraud by, *inter alia*, going to the SEC—but also has supported these allegations with affidavits from Evans and Barnes. That is more than sufficient at this stage.[1]

### Judge Knapp's First Prong: The Identification of An "Innocent Director"

Mr. Evans, a lawyer and former Congressman, became a Towers director in 1990 and resigned from the Towers Board in 1992. (Evans Aff. ¶¶ 2, 3, 6, 8.) Evans was Chairperson of the Towers audit committee, which was formed as a result of his recommendation to Towers' CEO Steven Hoffenberg. (Evans Aff. ¶¶ 7–8; *see also* Proposed 2d Cplt. ¶¶ 28–30.) Mr. Barnes, a former Texas Lieutenant Governor and Speaker of the Texas House of Representatives, also became a Towers outside director in 1990 and also served on the Towers audit committee. (Barnes Aff. ¶¶ 2, 5.)

In their roles as outside Towers directors, Mr. Evans and Mr. Barnes had discussions with Squadron Ellenoff partner Ira Sorkin about Towers' accounting practices and the SEC investigation of those practices. (Evans

---

1. Indeed, at oral argument Squadron Ellenoff's counsel conceded that where a party asserts a colorable, albeit questionable basis for standing, it does not have to prove standing at this stage as it would at trial. (*See* 10/17/97 Oral Arg. Tr. at 23.)

Aff. ¶¶ 9–12; Barnes Aff. ¶¶ 6–8; Proposed 2d Cplt. ¶¶ 31–38.) According to Evans and Barnes, Sorkin did not inform either of them of the Spicer & Oppenheim memorandum that "would have alerted [them] to deficiencies in Towers' accounting" practices. (Evans Aff. ¶ 12; *see also* Evans Supp. Aff. ¶¶ 2–3; Barnes Aff. ¶ 9; Proposed 2d Cplt. ¶¶ 32–33.) In addition, according to Evans and Barnes, Sorkin assured them that: (a) the funds raised by Towers from the Note offerings were being used for their intended purposes, (b) the receivables purchased by Towers were being correctly accounted for, (c) Towers was not involved in a Ponzi scheme, and (d) the SEC investigation was due "to the SEC's failure to understand Towers' business." (Evans Aff. ¶¶ 16–19; Barnes Aff. ¶ 9; *see also* Proposed 2d Cplt. ¶¶ 31–37.)

Thus, the Trustee has identified two Towers Board members who (allegedly) were ignorant of the ongoing fraud at Towers. This satisfies the first part of what Judge Knapp has required.[2] The second, and more difficult, part is whether Evans and/or Barnes "would have been able to prevent the fraud had he known about it." *Wechsler v. Squadron, Ellenoff,* 212 B.R. 34, 36.

### Judge Knapp's Second Prong: What Evans and Barnes Say They Would Have Done to Stop the Towers Fraud

Mr. Evans' original affidavit stated that had Squadron Ellenoff revealed the Spicer & Oppenheim memorandum to him, he would have taken the following corrective actions:

21. In retrospect, I can say that if Mr. Sorkin [of Squadron, Ellenoff] had answered my questions differently or disclosed to me the problems raised in the Spicer & Oppenheim memorandum, I could have taken corrective actions. I had told Mr. Hoffenberg on a number of occasions that he should retain a large, reputable accounting firm to audit Towers' books and records, and if I had been aware that there were problems with Towers' accounting procedures I would have been more insistent upon such action. Such a firm could have caused corrective disclosures to have been made to accurately reflect the true financial condition of the Company.

22. I would also have taken other actions. I would have sought my own counsel on these matters and would have raised my concerns with Ben Barnes, the other outside director. I also would have made direct disclosures to the SEC or Justice Department regarding the true nature of Towers' accounting, depending on the advice of my attorney(s).

23. I believe that these actions could have averted at least some of the losses suffered by Towers as a result of Hoffenberg's behavior, especially if they had occurred early in my tenure as a member of the Board of Directors.

(Evans Aff. ¶¶ 21–23.) Mr. Barnes similarly stated:

10. I would have told Mr. Hoffenberg that if he refused to take corrective action within the Company, I would inform the SEC or any other authority I felt appropriate that I was aware of fraudulent accounting activity at Towers. If Mr. Hoffenberg still refused to take corrective action, I would have carried through on my threat and gone to the SEC, either with or without the information disclosed by Mr. Sorkin. I would not have covered up the Towers' fraud and I would not have simply walked away without pursuing remedial measures.

---

2. Squadron Ellenoff continues to argue that because Hoffenberg and other wrongdoers dominated the Towers Board, Evans and Barnes cannot be Towers "decisionmakers" and thus the first part of what Judge Knapp required is not satisfied. (*See* 10/17/97 Oral Arg. Tr. at 20–21, 23–24.) Squadron Ellenoff, however, made that same argument to this Court and to Judge Knapp the first time around on this motion, and we both rejected it. Since it is undisputed that Hoffenberg and his cohorts had a majority on the Towers Board, there would have been no reason for Judge Knapp to remand if he accepted Squadron Ellenoff's argument that a "minority" director is not a relevant decisionmaker for *Wagoner* standing purposes. If there was an innocent Towers' director or officer, and if he could have taken action within the company or by going to outside authorities to stop Towers' fraud, the Trustee has standing. The Court again rejects Squadron Ellenoff's argument that Evans and Barnes do not fit the bill because Hoffenberg and his cohorts controlled the Board.

(Barnes Aff. ¶ 10; *see also* Proposed 2d Cplt. ¶¶ 39–41.)

In short, Mr. Evans and Mr. Barnes suggest two corrective actions they would have taken: (1) insisting that Towers hire a large, reputable accounting firm, and (2) seeking their own counsel and, depending on counsel's advice, disclosing information to the SEC or Justice Department.

Squadron Ellenoff responds that the first action would have been futile because the Towers Board was dominated by Hoffenberg and other wrongdoers. (Squadron Br. at 5–6.) Squadron Ellenoff notes that "Evans' only apparent effort to influence the direction of the company—urging the retention of a reputable accounting firm—was rebuffed by [by Hoffenberg] in terms that could leave no doubt about [Evans'] lack of authority: '[Hoffenberg] essentially told me [Evans] that if I did not like the way he did business I could resign from the Board of Directors. I did so immediately.'" (Squadron Br. at 6, quoting Evans Aff. ¶ 24; *see also* 10/17/97 Oral Arg. Tr. at 20–21, 23–24, 29–30.)

Of course, were Mr. Hoffenberg faced with outside directors like Evans and/or Barnes threatening to "blow the whistle" on Hoffenberg's fraud, Hoffenberg's (and his Board's) reaction might have been different than when merely faced with a director's suggestion to hire outside accountants. Indeed, at oral argument, the Trustee's counsel said that both he and Evans have had post-litigation conversations with Hoffenberg in which Hoffenberg said that he had hoped to stall the SEC to "grow the business by enough and hopefully outgrow the accounting problems," and that Hoffenberg regretted not having listened to Evans and Barnes. (10/17/97 Oral Arg. Tr. at 9–10, 11–12, 30.) The Trustee was invited to submit an affidavit(s) to this effect (10/17/97 Oral Arg. Tr. at 48–49), but did not do so. Squadron Ellenoff responds that the complaint alleges that Towers was a "massive Ponzi scheme," not just that there were "some accounting irregularities," and that Hoffenberg's protestations are incredible. (10/17/97 Oral Arg. Tr. at 29–30.) The Court agrees that, wearing a trier of fact hat, the Court would not give any credence to the argument that if challenged by Evans and/or

Barnes, Hoffenberg would have abandoned his Ponzi scheme. (*See* 10/17/97 Oral Arg. Tr. at 8–9, 11, 48–49.) The Court, however, need not decide whether it nevertheless must allow the Trustee's claim to proceed on this basis because the Court finds that the Trustee satisfies Judge Knapp's second prong through Evans'/Barnes' second proposed corrective action, going to the SEC, as discussed below.

With respect to the proposed second corrective action, Squadron Ellenoff's reply brief noted that Evans' original affidavit only said that he would consult with counsel and *might* then have gone to the SEC, not that he would have gone to the SEC. (*See* Squadron Br. at 12; *see also* 10/17/97 Oral Arg. Tr. at 13–14.) The supplemental Evans' affidavit, and the Barnes' affidavit, clarify that Evans and Barnes *would* have gone to the SEC. Thus, Evans now states:

4. If Mr. Sorkin—in response to my specific questions—had made me aware of the sorts of deficiencies in Towers' accounting practices and financial statements described in the Spicer & Oppenheim memorandum, or of the true nature of Towers' accounting practices I would have immediately undertaken to determine what remedial measures I might take. I most certainly would have demanded that Towers' outside lawyers provide me with a complete briefing as to the accounting and other problems at Towers, and I would have talked to Ben Barnes, the other outside director at Towers. I would also have approached my own counsel for advice on the best way for me to attempt to bring Towers' activities to the attention of the appropriate authorities, such as the SEC or Justice Department.

5. If I had been made aware of the serious problems with Towers' accounting, I would have told my attorney that I wanted to inform the proper authorities. If my attorney advised me that such a disclosure would not waive Towers' attorney-client privilege, I would have made a full and complete disclosure to the appropriate authorities regarding what I knew about Towers' accounting. If my attorney had advised me that a complete disclosure

might be a waiver of that privilege but that, in this circumstance, waiver of the privilege was appropriate and lawful because it would be for the benefit of Towers, I would have waived the privilege and made a full disclosure.

6. On careful reflection, I believe that even if my attorney had told me that a full disclosure constituted a waiver of Towers' attorney-client privilege *and* advised me against waiving that privilege, I would still have felt a responsibility to take action in light of the potential damage to so many people. I would have gone with my counsel to the appropriate authorities with whatever relevant information I had learned concerning the true nature of Towers' business. I also would have cooperated fully in any investigation of Towers.

(Evans Supp. Aff. ¶¶ 4–6.) Barnes similarly stated that he definitely would have gone to the SEC, with or without disclosing privileged information. (Barnes Aff. ¶ 10, quoted above.)

Thus, there is no longer an issue at this stage of the case about whether Evans (and Barnes) would have gone to the SEC; the issue is what they could say, and accomplish, if they went to the SEC.

### The Attorney–Client Privilege Would Not Bar Evans and/or Barnes from Going to the SEC

As to the second proposed "corrective action," that Evans and/or Barnes might have "blown the whistle" on Towers to the authorities, Squadron Ellenoff contends that they "would have been legally precluded" from doing so by Towers attorney-client privilege. (Squadron Br. at 11–14.)

The Supreme Court has held that "[i]t is by now well-established ... that the attor-

ney-client privilege attaches to corporations as well as to individuals." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985).

The issue facing the Court, therefore, is whether Evans and/or Barnes could have disclosed privileged information to the SEC over the objection of Hoffenberg and his cohorts, *i.e.*, over the objection of a majority of Towers' Board.[3]

In *Weintraub*, the Supreme Court further stated that:

[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors. The managers, of course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals.

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 348–49, 105 S.Ct. at 1991 (fn.omitted).

Relying on the first sentence of this *Weintraub* quote, Squadron Ellenoff asserts that Towers' privilege could only be waived by Towers, "acting through a majority vote of its board of directors," and that after the Hoffenberg-dominated Board refused to waive the privilege,[4] "Evans could not thereafter have taken it upon himself to contravene the Board's decision." (Squadron Br. at 13.) In support, Squadron Ellenoff cites *Milroy v. Hanson*, 875 F.Supp. 646, 648 (D.Neb.1995), and *Tail of the Pup, Inc. v. Webb*, 528 So.2d 506 (Fla.Dist.Ct.App.1988). Those cases, however, simply are inapposite.

---

3. Squadron Ellenoff contends that Sorkin's advice and the Spicer & Oppenheim memorandum are privileged (Squadron Br. at 13), the Trustee's briefs do not contest this (*see* Trustee Reply Br. at 8–9), and at oral argument the Trustee conceded, at least for purposes of the motion, that the Spicer & Oppenheim memorandum was privileged. (10/17/97 Oral Arg. Tr. at 17–18.) For purposes of this Opinion, therefore, the Court assumes that the information is privileged.

4. The Trustee responds that Squadron Ellenoff "again substitutes speculation for undisputed tes-

timony" and that "[o]nly through further discovery can this issue be determined." (Trustee Reply Br. at 7–8.) The Court, however, is not blind to reality. The chances are slim that Hoffenberg would have consented to disclosure to the SEC of privileged information that would have halted his Ponzi scheme. The issue, however, is not dispositive of the motion, because the Court finds that even if the Hoffenberg-controlled Board did not waive the privilege, Evans and/or Barnes would have taken corrective action by going to the SEC.

In *Milroy*, a director and minority shareholder brought a shareholder derivative and breach of fiduciary duty action against a closely-held corporation and its remaining directors and shareholders. 875 F.Supp. at 647. The shareholder-director moved to compel production of privileged company documents, on the ground that as a director the documents were not privileged as against him. *Id.* at 648. The Court denied the motion, stating, in the language quoted in Squadron Ellenoff's brief (at 14), that "an individual director is bound by the majority decision and cannot unilaterally waive or otherwise frustrate the corporation's attorney-client privilege if such an action conflicts with the majority decision of the board of directors." *Milroy v. Hanson*, 875 F.Supp. at 648. The court noted, however, that

> [T]his is not a case predicated upon [state] corporate law regarding whether Milroy, as a member of [the company's] board of directors, has some right to examine corporate documents in his role as a corporate director. He has filed suit, in major part, to benefit himself. He does not contend that under [state] corporate law he has some entitlement to documents in his fiduciary role as a corporate director. Furthermore, he has made no showing that he wants the documents to fulfill his fiduciary duty to [the company] and all its shareholders, as opposed to using the documents to further his personal goals in this litigation. Accordingly, the attorney-client privilege is properly asserted against Milroy, notwithstanding his position as a director of the corporation.

*Id.* at 650.

The second case cited by Squadron Ellenoff, *Tail of the Pup, Inc. v. Webb*, also involved a discovery request for privileged documents by a minority shareholder-director of a closely-held corporation. 528 So.2d at 506. The Florida court granted the company a protective order, stating, in the language quoted in Squadron Ellenoff's brief (at 14), that the minority director, "in his position as an individual stockholder, officer and director, has no authority to waive or assert the privilege against the wishes of the corporation's board of directors." 528 So.2d at 507.

*Milroy* and *Tail of the Pup* are distinguishable from the present case. Both involved a minority shareholder-director's attempt to compel production of privileged material that he had never seen in his capacity as a director, for use in a personal-benefit lawsuit against the company.

Moreover, in other cases, the courts have held that a director is entitled to discovery of privileged documents from the time he was a director. For example, in *Kirby v. Kirby*, No. Civ. A 8604, 1987 WL 14862 at *7 (Del. Ch. July 29, 1987), the Delaware Chancery Court ordered production of privileged documents created while plaintiffs were shareholders-directors in a closely-held company, explaining:

> As to those documents prepared prior to [plaintiffs' purported removal as directors], I am not persuaded that the attorney-client privilege may be invoked against plaintiffs. The issue is not whether the documents are privileged or whether plaintiffs have shown sufficient cause to override the privilege. Rather, the issue is whether the directors, collectively, were the client at the time the legal advice was given. Defendants offer no basis on which to find otherwise, and I am aware of none. The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.

In *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Civ. A. Nos. 13911 & 14595, 1996 WL 307444 at *4 n. 4 (Del.Ch. June 4, 1996), *appeal refused mem.*, 682 A.2d 625, 1996 WL 415923 (Del.1996), the Chancery Court clarified *Kirby's* "joint client" reference, as follows:

> Although the *Kirby* Court described the directors as a "joint client," a more accurate description of the relationship is that there was a single "client," namely, the entire board, which includes all its members. That is, a director seeking information furnished to the board that is the

subject of the privilege claim is a "client" not in his or her individual capacity, but as a member of the collective body (the board) of which the director is one member.

The *Moore* court granted plaintiff's motion to compel production of privileged company documents, holding that "Delaware case law supports [plaintiff's] position that as a general matter, a corporation cannot assert the [attorney-client] privilege to deny a director access to legal advice furnished to the board during the director's tenure." *Moore,* 1996 WL 307444 at *4 (citing, *inter alia, Kirby*).[5]

Here, in contrast to the above cases concerning whether to compel production of privileged documents to a director in litigation, it is conceded that Evans had "access" to the privileged information (*see* 10/17/97 Oral Arg. Tr. at 33); the issue is whether Evans, believing that there was wrongdoing by the company's officer-directors, voluntarily could disclose to the SEC privileged information already in his possession in his capacity as a director.[6]

The Trustee cites *Gregory v. Correction Connection, Inc.,* Civ. A. No. 88–7990, 1990 WL 182130 at *3 & n. 3 (E.D.Pa. Nov.20, 1990), for the proposition that "Evans, as a member of Towers' board of directors, would have had the authority to waive the attorney-

client privilege in order to serve the best interests of Towers," even over the opposition of the majority of Towers' Board. (Trustee Reply Br. at 9.) In *Gregory,* a director moved to compel the corporation to produce communications with outside counsel. The Court ordered the information produced, finding Gregory to be part of the attorney's "client," but also warned that if the director waived the privilege over the company's objection, the company could sue the director for breach of fiduciary duty:

> I conclude that Gregory, as Chairman of CCI's board, is among those CCI agents with management authority who are entitled to be privy to communications between CCI's management and CCI's counsel. Gregory is an extension of the very "client" that CCI's attorney-client privilege serves, and I am satisfied that he should have access to the discovery that he seeks. *Should he choose to waive CCI's attorney-client privilege by disclosing* in public filings in this court and through unsealed discovery [privileged] communications with [the company's] attorneys, *CCI and its shareholders would have an action for breach of fiduciary duty if such disclosure is not in the best interest of CCI.*

*Gregory v. Correction Connection,* 1990 WL 182130 at *3 (emphasis added & fns. omit-

---

5. For other cases holding that a corporate director is entitled to discovery of privileged documents he saw when a director and/or privileged documents from the period he was a director, *see, e.g., In re Hutchins (Hutchins v. Fordyce Bank and Trust Co.),* 211 B.R. 330, 333 (Bankr. E.D.Ark.1997) (former director, entitled to production of company's privileged documents for period he was director, since he is a "member of the class protected by the privilege ... [and may] inspect the documents without any breach of confidentiality"); *Glidden Co. v. Jandernoa,* 173 F.R.D. 459, 473–74 (W.D.Mich.1997) (under Del. law, "directors have a right to access attorney communications of the company relating to the time that they served as directors," citing *Kirby* and *Moore*); *Resolution Trust Corp. v. Adams,* No. 93–389–CIV–ORL–18, 1994 WL 315646 at *1 (M.D.Fla. April 14, 1994) ("this Court rejects any privilege asserted as to any [privileged] document that the discovering party previously had a right to possession, custody, or control" of as a corporate officer or director); *In re Braniff, Inc.,* 153 B.R. 941, 945–46 (Bankr.M.D.Fla.1993) (former officer-directors entitled to discovery of all privileged documents from their tenure on a

proper showing, but are entitled without any other showing to production of all privileged documents that "were actually used, handled, and seen ... in the past while he or she was serving as an officer or director"); *Gottlieb v. Wiles,* 143 F.R.D. 241, 247 (D.Colo.1992) (while "former officers and directors lack the power to waive the corporate privilege," a "corporation may not assert the attorney-client privilege against a former director" where the former director seeks discovery of the privileged documents, citing *Kirby*); *AOC Ltd. Partnership v. Horsham Corp.,* Civ. A. No. 12480, 1992 WL 97220 at *1 (Del.Ch.1992) (member of company board entitled to company's privileged information in discovery).

6. To be clear: Evans claims that he was not aware of the Spicer & Oppenheim memorandum. (Evans Aff. ¶ 12; Evans Supp. Aff. ¶ 3.) The issue before the Court, however, is whether, if Squadron Ellenoff had disclosed that memorandum (and other information about Towers' Ponzi scheme) to Evans, he could have provided that information to the SEC in order to halt Towers' Ponzi scheme.

ted);[7] *see also, e.g., Henshaw v. American Cement Corp.*, 252 A.2d 125, 128–29 (Del.Ch. 1969) (in upholding director's right to review corporate books and records, court notes that the director's "purpose is not improper because of the possibility that he may abuse his position as a director and make information available to persons hostile to the Corporation or otherwise not entitled to it. If [the director] does violate his fiduciary duty in this regard, then the Corporation has its remedy in the courts."); *Hoiles v. Superior Court*, 157 Cal.App.3d 1192, 1201–02, 204 Cal. Rptr. 111, 116–17 (Ct.App.1984) (in dicta, follows *Henshaw* ).

The case before this Court appears to be unique. It does not involve a shareholder-director trying to use privileged information for his private benefit in a lawsuit against the company. It does not involve a discovery request by a former director during litigation. It does not involve a former director's effort to learn privileged corporate information that he did not have access to in his capacity as a director. The unique issue here is whether Evans could have revealed the privileged information he had to the SEC, over the objections of Hoffenberg and his cohorts on the Towers Board. As a matter of factual allegation, Evans unequivocally states that he *would* have done so. (Evans Supp. Aff. ¶¶ 5–6.) As a matter of law, the Court concludes that Evans could have revealed privileged Towers information to the SEC. Nothing in the attorney-client privilege should prevent Evans from "blowing the whistle" to the SEC, including revealing privileged information, although such conduct could have subjected Evans to liability to Towers for breach of fiduciary duty. If Evans' revelation of privileged Towers information to the SEC was harmful to Towers, *i.e.*, not in the best interests of Towers (as opposed to Hoffenberg, et al.), Towers could

have sued Evans for breach of fiduciary duty. *See Gregory v. Correction Connection,* 1990 WL 182130 at *3; *Henshaw v. American Cement,* 252 A.2d at 128–29. (*See also* 10/17/97 Oral Arg. Tr. at 35.) And with the benefit of hindsight—including Hoffenberg's criminal guilty plea allocution—it is safe to say that Evans' disclosure to the SEC would not have subjected him to a successful breach of fiduciary duty claim by Towers.

The Court believes that application of this rule—the director may reveal privileged information to governmental authorities, subject to being sued for breach of fiduciary duty—best comports with public policy. It encourages, or at least permits, an outside director to fulfill his fiduciary obligation to the company's public shareholders where he believes that company management and the majority of the company's board are engaged in wrongdoing. It nevertheless protects the company's privilege as much as possible, since the company can sue the director for breach of fiduciary duty if his disclosure is not in the company's best interest. A director will not lightly disclose privileged information that can subject him to millions of dollars of personal liability. But where the director believes the situation requires "whistle blowing," the courageous director can act. In contrast, the view espoused by Squadron Ellenoff would require a director who has discovered fraud by company insiders to do little more than resign, while allowing the fraud to continue. Public policy should not, and the Court believes does not, require a director to be handcuffed in that way.

In short, Evans (and/or Barnes) could have provided privileged information to the SEC (subject only to the risk of a breach of fiduciary duty lawsuit by Towers), and he has stated that he would have done so.

Finally, in a last-ditch effort to scuttle this lawsuit, Squadron Ellenoff argues that even

---

**7.** The *Gregory* court assumed that disclosure by one corporate director without the company's consent results in a waiver of the attorney-client privilege. The Court does not believe this assumption is necessarily correct. However, because the issue before the Court is whether Evans/Barnes could disclose, and *not* whether such disclosure would result in a waiver of Towers' attorney-client privilege, the Court need not decide the waiver issue. For cases that have ruled on this issue, *see, e.g., Allen v. Burns Fry, Ltd.*,

No. 83 C 2915, 1987 WL 12199 at *3 (N.D.Ill. June 8, 1987) (production of privileged document by former corporate officer does not waive company's privilege); *Interfaith Housing Delaware, Inc. v. Town of Georgetown,* 841 F.Supp. 1393, 1398–400 (D.Del.1994) (by analogy to corporate law, each member of town council "share[s] in its attorney-client privilege," but public statement by one council member does not waive privilege).

if Evans and/or Barnes had revealed privileged information to the SEC, he could not have disclosed "anything that the SEC did not already know." (Squadron Br. at 15; *see also* 10/17/97 Oral Arg. Tr. at 35, 38–39.) According to Squadron Ellenoff, "[i]n the absence of concrete *proof* of fraud at Towers, Evans could do nothing more than share suspicions with the SEC and encourage it to pursue its ongoing investigation to conclusion—which, of course, it did anyway." (Squadron Br. at 15; *see also* 10/17/97 Oral Arg. Tr. at 38–39.) Squadron Ellenoff's argument would require the Trustee, before undertaking discovery, to *prove* its entire case. Judge Knapp's Order was not meant to eliminate the rule that a complaint need only contain "a short and plain statement" supporting the Court's jurisdiction and plaintiff's claim. Fed.R.Civ.P. 8(a). The Trustee has sufficiently alleged that if Evans disclosed the Spicer & Oppenheim memorandum or other privileged information to the SEC a year or two before the SEC finally sued Towers, the SEC could have taken action to stop Towers' Ponzi scheme long before it eventually did.

### Even if Evans and/or Barnes Could Not Disclose Privileged Information to the SEC, He Could Have Gone to the SEC

Finally, the Court believes that even were Squadron Ellenoff correct (which it is not) that Evans and/or Barnes could not have disclosed privileged information to the SEC, they still could have stopped the fraud by going to the SEC. Although the SEC was already investigating Towers, if Evans and/or Barnes had gone to the SEC and said, in effect, "I have resigned from the Towers Board because of information I just learned about its operations, and while I cannot disclose that information to you because of the company's attorney-client privilege, I can tell you that you really should expedite your investigation of Towers," the SEC likely would have done so and brought suit against Towers much earlier than it eventually did.[8] Thus, even without revealing privileged information, Evans and/or Barnes could have stopped the Towers fraud earlier by going to the SEC, satisfying Judge Knapp's second requirement for the amended complaint.

8. The Court notes that the SEC began its investigation in late 1990 or early 1991 and did not sue

### CONCLUSION

For the reasons set forth above, the Court finds that the Trustee's proposed Second Amended Complaint, and accompanying Evans' and Barnes' affidavits, satisfies both requirements set by Judge Knapp—(1) the Trustee has identified former Congressman Evans (and former Texas Lieutenant Governor and legislator Ben Barnes) as a Towers director (allegedly) "ignorant of the ongoing fraud" and (2) "explain[ed] how [Evans and Barnes] could and would have brought the fraud to an end" by going to the SEC, with or without disclosing privileged information to the SEC. The Trustee is not required to do more at the initial pleading stage. Any further testing of the Trustee's case will come through discovery, a motion for summary judgment and/or at trial.

The parties are to contact my courtroom deputy within five days of receipt of this Report and Recommendation to schedule a status conference to discuss discovery. That conference should also be attended, at least telephonically, by plaintiffs' liaison counsel in *In re Towers,* 93 Civ. 0810.

November 7, 1997.

Towers until February 1993. (*See* 10/17/97 Oral Arg. Tr. at 39.)